Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

JS-6

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 4782 | **DATE** | 3/12/2003 |
| **CASE TITLE** | Robin E. Davis vs. Chicago Transit Authority | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: CTA's motion for summary judgment (16-1) is granted.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAR 13 2003 date docketed | 41 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/12/2003 | |
| GL | courtroom deputy's initials | 03 MAR 12 AM 10:38 Date/time received in central Clerk's Office | date mailed notice GL mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ROBIN E. DAVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 01 C 4782 |
| ) | |
| CHICAGO TRANSIT AUTHORITY, ) | |
| ) | |
| Defendant. ) | DOCKETED |
| ) | MAR 1 3 2003 |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff Robin E. Davis filed a two-count complaint against Defendant, the Chicago Transit Authority ("CTA"), alleging that the CTA: (1) violated the Equal Pay Act ("EPA"), 29 U.S.C. §216(d), by paying her less than a male predecessor; and (2) violated Title VII, 42 U.S.C. §2000 *et seq.* by paying her less than a male predecessor, and retaliating against her for complaining about the wage disparity. The CTA filed a motion for summary judgment on both counts. For the reasons set forth below, this Court grants the CTA's motion.

## I. BACKGROUND[1]

The CTA is a municipal corporation that operates the nation's second largest transit system providing transit services to customers in the Chicago, Illinois metropolitan area. The CTA has employed Davis, a female, since 1985. Davis worked as a bus operator from 1985 until 1990, when an individual attacked her on a bus. As a result of the attack, Davis entered the CTA's light duty program under which she worked part-time. While on light duty, Davis worked in the CTA's mailroom and as an administrative assistant at the CTA's Merchandise Mart headquarters facility.

---

[1] The following facts are culled from the parties' Local Rule 56.1 Statements of Material Facts.

In 1993, the CTA transferred Davis to its West Shops facility, where she accepted a full-time position in the Maintenance Administration Department ("MAD") as a payroll clerk. Unionized and certain non-unionized jobs at the CTA are categorized by grade level. The grade level at which a position is classified corresponds with a certain level of pay – the higher the grade level, the higher the level of pay. Payroll clerks in the MAD are members of the Amalgamated Transit Union, Local 241 ("Union") and are responsible for preparing the payroll for various CTA employees. The position of payroll clerk in the MAD is classified as a Grade 4 position, which is payable at a rate of $17.15. Davis is a member of the Union and has been a Grade 4 payroll clerk since 1993.

The MAD provides administrative support to various departments within the CTA's Maintenance Division. From 1993 until December 1998, Davis prepared the payroll for a group of CTA maintenance employees, including steamfitters, plumbers, stationary engineers, machinists, and elevator and escalator repairmen. In December 1998, Davis successfully bid on a payroll clerk position that involved preparing the payroll for employees in the Utility Department ("utility payroll"), namely service truck chauffeur drivers who operate the CTA's non-revenue service vehicles. Davis remained a Grade 4 payroll clerk and was paid at a rate of $17.15 per hour.

Prior to a re-organization of the MAD in mid-1997, the individual working in the position of general clerk II in the Utility Department was responsible for preparing the utility payroll. During that same time, some departments within the Maintenance Division, including the Utility Department, handled some of their own administrative functions. The job description for general clerk II therefore detailed the administrative duties the person working in that position had the responsibility to complete. The list of administrative duties included: entering information on personnel requisitions, accident forms, and retirement forms, preparing telephone expense reports and distributing telephone expense checks, maintaining personnel records, and performing the duties of the position of material dispatcher

II in peak periods and absences.[2] The general clerk II position was classified as a Grade 7 position, payable at a rate of $20.00 per hour.

The CTA employed Joseph Henderson as general clerk II in the Utility Department until his retirement in mid-1997.[3] The parties agree that Henderson prepared the utility payroll during the course of his employment as general clerk II. The parties disagree, however, about the extent to which Henderson performed the administrative duties listed in the job description. At the time of Henderson's employment, both the Manager of the MAD, Richard Jania, and the Administrative Coordinator of the MAD, James Chmill, had personal knowledge of Henderson's responsibilities. Jania admits that Henderson never entered information on personnel requisitions. Jania does not know if Henderson ever entered information on accident forms. Jania explains that he witnessed Henderson reviewing retirement forms, which were submitted to Chmill. Jania avers that Henderson compiled and submitted telephone expense reports to him for approval. According to Jania, Henderson also maintained the personnel records. Jania and Chmill believe Henderson had the requisite knowledge and judgment required to perform the duties of material dispatcher II. However, it is unclear whether Henderson ever filled in as material dispatcher II while working as general clerk II.

Davis concedes that she has no personal knowledge about what administrative duties Henderson performed as general clerk II. Evelyn Stewart, a CTA employee at the West Shops facility, visited

---

[2] Material dispatchers are responsible for assigning non-revenue vehicles and drivers to particular tasks and ensuring that those assignments are carried out. There are two material dispatcher II positions at the CTA. When one dispatcher is absent, the other covers for his position. Henderson would have only filled in as a dispatcher if both dispatchers were absent. In his deposition, Jania states that he has no personal knowledge of a time when both dispatchers were absent during Henderson's employment as general clerk II. Jania Dep. at 14-15. However, in his affidavit, Jania states that Henderson "occasionally performed" the duties of material dispatcher. Jania Aff. at ¶10.

[3] Neither party provided this Court with information regarding the length of Henderson's employment as general clerk II.

3

Henderson at his office two to three times a week, for a total of two hours each week. Stewart did not work directly with Henderson, and was unaware of all of Henderson's job duties. During some of her visits to Henderson's office, Stewart watched him prepare the utility payroll. Stewart occasionally helped Henderson complete the utility payroll sheets, sometimes by retrieving documents from unlocked file cabinets. When Stewart was in Henderson's office, she never saw telephone expense reports, retirement forms, or personnel records in Henderson's office. Moreover, Stewart never witnessed Henderson compile telephone expense reports, review retirement forms, or perform the duties of material dispatcher II.

Following Henderson's retirement in mid-1997, Chmill recommended to Jania that the CTA's West Shops facility be reorganized. As part of that reorganization, Chmill suggested that the administrative duties included in the job description of the Grade 7 general clerk II position be reassigned to supervisory, non-Union CTA employees, and that the remaining duty of preparing the utility payroll be reclassified as a Grade 4 payroll clerk position. Chmill explained that it was appropriate to reclassify the remaining job of preparing the utility payroll to a Grade 4 position given that payroll clerks with similar responsibilities in the MAD were also Grade 4 employees. Jania approved the reorganization of the West Shops facility. The duties of the general clerk II position were reassigned and reclassified in accordance with Chmill's recommendation.[4]

The CTA subsequently posted the new payroll clerk position pursuant to the Collective Bargaining Agreement ("Agreement") between the CTA and the Union. The Agreement requires the CTA to award the job to the individual with the greatest seniority among qualified applicants, without regard to sex. Thus, when it posted the new position, the CTA did not know if the successful bidder

---

[4]Davis admits that the CTA reassigned and reclassified the duties of the position of general clerk II. She further admits that she has no personal involvement, and therefore no personal knowledge, regarding the process of reassigning and reclassifying the duties of the position.

4

would be a man or a woman.[5] In late 1997, the CTA awarded the utility payroll clerk position to Lourdes Gray, a female, who worked in that new position until her formal retirement from the CTA on January 1, 1999.[6] Shortly before Gray's retirement, the CTA posted the payroll clerk position in compliance with the terms of the Agreement. Davis successfully bid on the position and began work, which included on-the-job training with Gray, in late December 1998. Davis formally succeeded Gray upon her retirement and retained the position until June 2000.

Davis' central responsibility in her new position was to prepare the utility payroll. She maintained records of the first step of utility truck chauffeur grievances, records of OSHA reports, and certain payroll records of the material dispatchers. Davis also compiled reports for weather-related and

---

[5]The CTA produced documents and statistics regarding the twelve Grade 4 payroll clerk positions that were posted in accordance with the Agreement between June 1999 and June 2002. In that time, the CTA awarded the twelve vacant payroll clerk positions, which had previously been filled by eleven women and one man, to nine women and three men. Specifically, on June 22, 1999, the CTA posted seven payroll clerk positions available at the Merchandise Mart. Out of thirty-five applicants, twenty-eight were female and seven were male. The CTA awarded the seven positions, which were previously held by seven women, to five women and two men. On January 18, 2000, the CTA posted three payroll clerk positions available at its West Shops facility. Of the thirty-three applicants, twenty-four were female and nine were male. The CTA awarded the three positions, all of which were previously held by women, to three women. On October 16, 2001, the CTA posted two positions for payroll clerk at its West Shops facility. Out of twenty-eight applicants, twenty-four were female and four were male. The CTA awarded the positions, which were previously held by two women, to one woman and one man.

With regard the promotion of females, in December 1999, the CTA promoted Grade 4 payroll clerk Elizabeth Kilcommons to general clerk I, a Grade 6 position, at its West Shops facility. Kilcommons, a female, succeeded Eugene Townsend, a male. As general clerk I Kilcommons prepares a payroll and is responsible for ensuring that the other payrolls at the facility are prepared properly.

[6]Eugene Townson, general clerk I, a Grade 6 position, was responsible for completing Henderson's work between Henderson's retirement and Gray's assumption of the new payroll clerk position. Ophelia Guice helped Townson prepare the utility payroll. During that time, Guice never saw paperwork related to the administrative duties that were included in the job description for general clerk II. Guice never performed any of those duties while assisting Townson.

5

other emergencies. Davis did not perform the administrative duties that were included in the job description of general clerk II prior to the reassignment and reclassification of that position.

In May 2000, Davis learned of the disparity in pay between her Grade 4 payroll clerk position in which she earned $17.15 per hour, and the general clerk II position in which Henderson, a male, had earned $20.00 per hour. Davis complained internally to Jania regarding the pay disparity in a letter dated June 8, 2000. On July 26, 2000 Davis filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued Davis a notice of her right to sue the CTA on March 29, 2001. Davis filed the instant lawsuit against the CTA on June 22, 2001. In response to Davis' complaints, the CTA allegedly retaliated against her on seven occasions.

Davis concedes that three of the seven occasions of purported retaliation took place before she complained about the wage disparity.[7] The remaining four occasions of alleged retaliation occurred after Davis complained. First, Davis claims that the CTA responded to her complaints by taking away her parking space at its West Shops facility. The CTA has no knowledge regarding Davis' claim and has no record that Davis ever had an assigned space. Davis describes the loss of the space as "troubling" and an "inconvenience." Second, Davis asserts that after she complained, employees in the MAD

---

[7]First, in February 2000, CTA employees Steve Klemm and Bob Gierut allegedly told Davis that she was making too much money and working too many hours. Second, in March 2000, Lisa Klemm, Chmill's replacement as Administrative Coordinator following his retirement in January 2000, changed Davis' job title from maintenance administration clerk to posting clerk. Although Davis' job title changed, Davis remained a Grade 4 payroll clerk who was responsible for preparing the utility payroll. Davis continued to work the same hours at the same hourly rate of $17.15. She still worked in the same job location and reported to the same supervisor. Third, on or about June 1, 2000, Klemm and Jania informed the payroll clerks that the clerks would rotate their payrolls beginning on the first date of the July pay period. In accordance with this announcement, the CTA transferred Davis from preparing the utility payroll to preparing the track maintenance and laborer payroll. Several other clerks were involved in the rotation, each of whom took over a payroll they had not previously prepared. Davis' allegation of a retaliatory job transfer is the only allegation of retaliation in her complaint. Davis identified the six other incidents of purported retaliation during her deposition.

6

ostracized her pursuant to Jania and Klemm's instructions. Jania and Klemm deny that they directed anyone to refrain from socializing with Davis. Davis has no personal knowledge to dispute Jania and Klemm's denial. Third, Davis speculates that CTA cafeteria worker Joe Pozzi punctured her tire as an act of retaliation. Davis has no personal knowledge to support her allegation. Finally, Davis contends that Jania issued her a "caution and instruct" notice in July 2001 for excessive phone usage in retaliation for her complaints. Jania issued such a notice to all of the payroll clerks in his chain of command at approximately the same time, none of whom have complained about being discriminated against.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is proper only when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). Once the moving party has met this burden of production, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

### B. Equal Pay Act

Davis claims that the CTA violated the EPA by paying her less than a male predecessor, Joseph Henderson, for the allegedly equal work of preparing the utility payroll. To establish a prima facie case

under the EPA, a plaintiff must demonstrate that: (1) the employer paid different wages to employees of opposite sexes; (2) for equal work requiring equal skill, effort and responsibility; and (3) the employees worked under similar working conditions. *See* 29 U.S.C. §206(d)(1); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). To succeed, the plaintiff must "show that the jobs compared are substantially equal, based upon job performance and content – not job titles, classifications or descriptions." *Markel v. Regents of the Univ. of Wisconsin*, 276 F.3d 906, 912 (7th Cir. 2002) (citations omitted). The plaintiff need not prove that the work is identical. *See Fallon v. State of Illinois*, 882 F.2d 1206, 1209 (7th Cir. 1989). Rather, the two jobs at issue must have a "common core" of tasks that make a "significant portion" of those jobs identical. *Id.* (citation omitted). If the plaintiff sets forth this "common core," the defendant must identify "any additional tasks that make the jobs substantially different." *Id.* (citation omitted).

The parties agree that the CTA paid different wages to Henderson and Davis, employees of the opposite sex. The parties also concur that Henderson and Davis worked under similar working conditions. The parties disagree, however, as to whether Henderson and Davis performed equal work for those wages. Davis asserts that the positions Davis and Henderson filled were substantially equal because a significant portion of both jobs was devoted to the task of preparing the utility payroll. From January 1, 1999 until June 2000, Davis worked at the CTA's West Shops facility as the payroll clerk whose central responsibility was to prepare the utility payroll. Prior to a reorganization of the MAD in mid-1997, the individual working in the position of general clerk II in the Utility Department was responsible for preparing the utility payroll. Henderson held the position of general clerk II until his retirement in mid-1997.

The CTA counters that Henderson had administrative responsibilities that made his position as general clerk II substantially different from Davis' position of payroll clerk. Richard Jania, Manager of

8

the MAD, avers that Henderson, in addition to preparing the utility payroll, reviewed retirement forms, compiled and submitted telephone expense reports, and maintained personnel records. Neither Jania nor James Chmill, Administrative Coordinator at the time of Henderson's employment, disclose how often Henderson performed these additional tasks. Evelyn Stewart, a CTA employee at the West Shops facility, never saw retirement forms, telephone expense reports, or personnel records during her weekly visits to Henderson's office. According to Stewart, Henderson occasionally prepared the utility payroll during her visits to his office, but never performed any other work-related task. In light of the parties' disagreement regarding Henderson's performance of administrative duties, we find that a genuine issue of material fact remains as to whether the positions Henderson and Davis held were substantially equal. Davis has therefore raised a triable issue of fact as to whether she can prove a prima facie case under the EPA.

Once a plaintiff sets forth a prima facie case under the EPA, the burden of proof shifts to the defendant employer to demonstrate that the pay disparity is due to: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) any other factor other than sex." 28 U.S.C. §206(d)(1)(i)-(iv); *see also Fyfe v. City of Ft. Wayne*, 241 F.3d 597, 600 (7th Cir. 2001). The CTA relies on the fourth affirmative defense, which provides a "broad catch-all exception that embraces a nearly limitless array of ways to distinguish among employees." *Fyfe*, 241 F.3d at 600 (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1462 (7th Cir. 1984)). In cases involving the "factor other than sex" defense, however, the factor need not "be related to the requirements of the particular position in question, or . . . be a business-related reason." *Fallon*, 882

F.2d at 1211 (citation and internal quotation omitted). Instead, the factor must only be applied in a non-discriminatory manner and have a non-discriminatory effect. *See id.*[8]

The CTA submits that the wage disparity between Davis and Henderson was due to the gender-blind reassignment and reclassification of the duties of the general clerk II position following Henderson's retirement in mid-1997. The Seventh Circuit found a similarly non-discriminatory job reclassification to be a valid factor under the fourth affirmative defense. *See Patkus v. Sangamon-Cass Consortium*, 769 F.2d 1251, 1261 (7th Cir. 1989). Davis concedes that she has no personal knowledge regarding the reassignment and reclassification of the duties of the general clerk II position. Nonetheless, she asserts that the CTA reclassified the position with a discriminatory intent, and that the reclassification had a discriminatory effect on women.[9] Davis contends that the CTA reclassified the job of preparing the utility payroll to a Grade 4 position because it was unwilling to employ, and therefore pay, a female at the Grade 7 rate at which it employed a male, Henderson, for the same work. She purports that the CTA knew that the successful bidder on the new position would be a female because it "knew that its payroll clerk positions were predominantly female, and the applicants for the payroll clerk positions were predominately female." Pl. Sur-Reply at 6.

Apart from her mere assertions, Davis sets forth no evidence in support of the above contentions. In contrast, the CTA provides the non-discriminatory reasons it reclassified the job of preparing the

---

[8]Importantly, the Seventh Circuit has expressed its uncertainty as to whether "whether a discriminatory effect, or disparate impact, caused by the factor other than sex negates the factor." *Fallon*, 882 F.2d at 1211 n.4. While the court declined to decide the issue, it suggested that a factor would not be negated if it was enacted without a discriminatory purpose but caused a disparate impact. *See id.* The court reasoned that such an outcome "would be consistent with the broad reading given the catch-all defense." *Id.*

[9]Davis only presents an argument regarding the discriminatory effect of the reclassification. In analyzing that argument, however, we believe that it attacks both the CTA's intent in reclassifying the position and the effect of the reclassification. Consequently, we address both issues *infra*.

utility payroll to a Grade 4 position. Chmill recommended the change as part of a larger re-organization of the West Shops facility. At the time of his recommendation, Chmill explained that after reassigning the administrative duties of the general clerk II position to supervisory CTA employees, it was appropriate to reclassify the remaining duty of preparing the utility payroll to a Grade 7 position. He noted that all other payroll clerks in the MAD with similar responsibilities were also Grade 4 employees. When the CTA posted the new payroll clerk position, it did so pursuant to the Collective Bargaining Agreement between the CTA and the Union which requires the CTA to award the job to the individual with the greatest seniority among qualified applicants, without regard to sex. Thus, when the CTA posted the position, it did not know if the successful bidder would be a male or a female.

The CTA also presents evidence that the reclassification of the position had a non-discriminatory effect on women. Although women continue to serve in the majority of payroll clerk positions, female representation in those positions did not further increase, as Davis suggests it would have, after the reclassification. The CTA posted twelve Grade 4 payroll clerk positions in accordance with the Agreement between June 1999 and June 2002. In that time, the CTA awarded the twelve vacant payroll positions, which had previously been filled by eleven women and one man, to nine women and three men. Five of the vacant payroll positions were located at the CTA's West Shops facility. The CTA posted three of the positions on January 18, 2000, and two of the positions on October 16, 2001. The CTA awarded the positions, which were previously held by five women, to four women and one man. Meanwhile, in December 1999, the CTA promoted Grade 4 payroll clerk Elizabeth Kilcommons to general clerk I, a Grade 6 position, at its West Shops facility. Kilcommons, a female, succeeded, Eugene Townsend, a male, in the position.

In light of the CTA's evidence, we find that the wage disparity between Davis and Henderson was due to a "factor other than sex" – that is the gender-blind reassignment and reclassification of the

11

duties of the general clerk II position following Henderson's retirement in mid-1997. Davis' mere allegations regarding the discriminatory intent of the CTA in reclassifying the position and the discriminatory effect of the reclassification are not enough to raise a triable issue of fact. *See Markel v. Regents of the Univ. of Wisconsin*, 276 F.3d 906, 912 (7th Cir. 2002) (summary judgment appropriate where defense established affirmative defense and plaintiff offered no evidence to rebut that defense). We therefore grant the CTA's motion for summary judgment on Davis' EPA claim.

### C. Title VII

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.§2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against any employee for opposing an unlawful employment practice. *See* 42 U.S.C.§2000e-3(a). A plaintiff may establish a Title VII claim either by offering direct proof of sex-based discrimination or retaliation, or by presenting evidence indirectly under the *McDonnell Douglas* burden-shifting analysis. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995). Davis does not purport to offer direct proof of discrimination or retaliation. Therefore, the burden-shifting approach is the proper legal analysis for her Title VII claims.

The *McDonnell Douglas* analysis involves three steps. First, the plaintiff must establish a prima facie case of discrimination. *See* 411 U.S. at 802. If the plaintiff succeeds in doing so, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its action. *See id.* Finally, if the defendant meets this requirement, the burden shifts back to the plaintiff to present evidence that the reason provided by the defendant is pretextual. *See id.* at 804. If the plaintiff does not satisfy her initial burden of establishing a prima facie case, the defendant is entitled to summary judgment, and the court

need not proceed to evaluate the second and third steps in the process. *See Oest v. Illinois Dep't of Corrections*, 240 F.3d 605, 610 (7th Cir. 2001).

### 1. Wage Discrimination

In a wage discrimination claim under Title VII, a plaintiff must ultimately prove that her employer paid her less than a male counterpart because of her gender. *See Ghosh v. Indiana Dep't of Envtl. Management*, 192 F.3d 1087, 1094 (7th Cir. 1999); *see also Johnson*, 70 F.3d at 478. In order to establish a prima facie case, the plaintiff must set forth evidence that she was paid less than a similarly-situated male. *See Johnson*, 70 F.3d at 478. Even if Davis was able to demonstrate that the CTA paid her less than Henderson for equal work, she would bear the burden of showing that the CTA's reason for the wage disparity – the gender-blind reassignment and reclassification of the duties of the general clerk II position following Henderson's retirement – was pretextual. *See id.* It is a burden that she cannot meet. Indeed, "a successful affirmative defense to an Equal Pay Act claim likewise serves as a valid defense to a claim based on Title VII." *Fallon v. State of Illinois*, 882 F.2d 1206, 1213 (7th Cir. 1989) (citing *Patkus*, 769 F.2d at 1260 n.5). Given our finding that the CTA set forth a valid affirmative defense to Davis' EPA claim, we must also grant the CTA's motion for summary judgment on Davis' Title VII wage discrimination claim.

### 2. Retaliatory Action

In order to establish a prima facie case of retaliation under Title VII, Davis must show that: (1) she engaged in a statutorily protected activity; (2) she was performing her job satisfactorily at the time of the adverse employment action; (3) she suffered an adverse employment action; and (4) similarly situated employees who did not engage in statutorily protected activity were treated more favorably than Spencer. *See Stone v. City of Indianapolis Public Utils. Div.*, 281 F.3d 640, 643-44 (7th Cir. 2002).

Davis first complained about the wage disparity in a letter to Jania dated June 8, 2000. In response to this and other subsequently filed complaints, Davis claims that the CTA retaliated against her on seven occasions. It is axiomatic that an employer cannot retaliate against an employee before she complains about an unlawful employment practice. *See Johnson v. Nordstrom, Inc.*, 260 F.3d 727, 735 (7th Cir. 2001). Davis concedes that three of the seven occasions of purported retaliation occurred before she complained about the wage disparity.[10] Thus, Davis cannot provide the necessary causal link between the adverse action and the protected activity.

The remaining four occasions of alleged retaliation occurred after Davis complained. First, Davis claims that the CTA responded to her complaints by taking away her parking space at its West Shops facility. The CTA has no knowledge regarding Davis' claim and has no record that Davis ever had an assigned space. Davis describes the loss of the space as "troubling" and an "inconvenience." Davis' mere assertion, without more, is not enough to defeat the CTA's motion for summary judgment. *See Hall v. Bodice Elec. Co.*, 276 F.3d 345, 354 (7th Cir. 2002) (noting that "[i]t is well settled that conclusory allegations and self-serving affidavits, without support in the record, do not create a triable issue of fact."). Furthermore, an adverse action must be "more than a mere inconvenience" to be actionable. *See Oest*, 240 F.3d at 612.

Davis secondly asserts that after she complained, employees in the MAD ostracized her pursuant to Jania and Klemm's instructions. Jania and Klemm deny that they directed anyone to refrain from socializing with Davis. Third, Davis speculates that CTA cafeteria worker Joe Pozzi punctured her tire as an act of retaliation. Davis has no personal knowledge and presents no evidence that either of these alleged actions were retaliatory. Again, Davis' allegations alone are not enough to survive the CTA's

---

[10]The first three incidents occurred between February 2000 and June 1, 2000. *See supra* n. 7 for details of each of the incidents.

14

motion for summary judgment. *See Hall*, 276 F.3d at 354. Davis finally contends that Jania issued her a "caution and instruct" notice in July 2001 for excessive phone usage in retaliation for her complaints. Davis fails to demonstrate how she was treated differently than similarly situated employees who did not engage in a statutorily protected activity. Indeed, Jania issued such a notice to all of the payroll clerks in his chain of command at approximately the same time, none of whom have complained about being discriminated against. We therefore find that the CTA is entitled to summary judgment on Davis' retaliatory action claim.

### III. CONCLUSION

For the foregoing reasons, this Court grants the CTA's motion for summary judgment. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated 3/12/03

# United States District Court
## Northern District of Illinois
### Eastern Division

Robin E. Davis

v.

Chicago Transit Authority

**JUDGMENT IN A CIVIL CASE**

Case Number: 01 C 4782

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

☐ Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Davis' allegations alone are not enough to survive the CTA's motion for summary judgment. Davis fails to demonstrate how she was treated differently than similarly situated employees who did not engage in a statutorily protected activity. We therefore find that the CTA is entitled to summary judgment on Davis' claims. The CTA's motion for summary judgment is granted.

Michael W. Dobbins, Clerk of Court

Date: 3/12/2003

Gladys Lugo, Deputy Clerk